UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Becky Bessette,

       Plaintiff,

       v.                               Civil Action No. 2:14-cv-79-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

       Defendant.


**<u>OPINION AND ORDER</u>**
(Docs. 14, 15)

       Plaintiff Becky Bessette brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying her application for supplemental security income (SSI). Pending before the Court are Bessette's motion to reverse the Commissioner's decision (Doc. 14), and the Commissioner's motion to affirm the same (Doc. 15). For the reasons stated below, Bessette's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings and a new decision.

**<u>Background</u>**

       Bessette was 35 years old on her alleged disability onset date of April 9, 2011. She dropped out of high school at the age of 15, after becoming pregnant with her first son. (AR 269.) She receives food stamps, Medicaid, and general assistance; and has never held a job for more than approximately two months. (AR 792.) During the alleged

disability period, Bessette lived in an apartment attached to her parents' house.  (*Id.*;
AR 42.)  She has three sons, the youngest approximately 16 years old.  (*Id.*)  Although
she maintains contact with her sons, she relinquished custody of them to family members
approximately 10 years ago.  (*Id.*; AR 303.)

Bessette had a troubled childhood, experiencing parental neglect due to her
parents' alcohol and gambling problems.  (AR 269.)  She had attentional and behavioral
problems in school, getting into fights with teachers and peers which resulted in multiple
suspensions.  (AR 792.)  From age seven to twelve, Bessette was molested by a family
member, and thereafter was a victim of domestic abuse by her first two husbands, the
fathers of her sons.  (*Id.*; AR 269, 288, 700, 953–54.)  Her second husband committed
suicide while in prison, after Bessette had left him for another man.  (AR 42–43, 339,
792, 956.)

In 2003, Bessette was diagnosed with bipolar affective disorder and a history of
significant drug and alcohol abuse requiring multiple hospitalizations and detoxification
attempts.  (*See, e.g.*, AR 288–89, 916, 953, 957.)  She began drinking alcohol at age nine
and abusing drugs (mostly cocaine) at age 13; she has had at least seven residential
treatments for drug and alcohol abuse.  (AR 302, 792.)  Bessette has a criminal history,
including charges of shoplifting, burglary, holding stolen property, and assault.  (AR
792.)  She has been incarcerated for a total of approximately three years as a result of
these charges, and has been placed in isolation at times during her incarceration because
of fights with guards and other inmates.  (*Id.*)  At the December 2012 administrative
hearing, Bessette testified that she has been sober since March 29, 2010 and has been off

all drugs except Suboxone since April 2007.  (AR 41–42.)  She further testified that she had been taking lithium for her bipolar disorder for about nine years.  (AR 36.)

In addition to bipolar disorder, Bessette has been diagnosed with posttraumatic stress disorder (PTSD) resulting from her history of abusive relationships.  (AR 290, 304, 598, 793, 916, 956–57.)  She has also exhibited symptoms of attention deficit hyperactivity disorder (ADHD), obsessive compulsive disorder (OCD), anxiety, intermittent explosive disorder, and personality disorder with antisocial and paranoid features.  (AR 290, 304, 339, 793–94, 815, 1308.)  Bessette also has sleep problems, sometimes staying awake all night and sleeping during the day.  (AR 36, 289.)  She suffers from back, ankle, and leg pain as well.  Bessette testified at the December 2012 administrative hearing that, on a typical day, she naps (because often, she has not slept at night), watches television, and writes in a journal.  (AR 37.)  She stated that her mother does the cooking and food shopping, and helps with the cleaning.  (AR 37–38; *see also* AR 303, 536.)  Her Function Reports similarly indicate that she sleeps during the day and relies on her mother to clean her apartment and cook her meals.  (AR 226–29, 534–37.)

In April 2011, Bessette protectively filed an application for SSI, alleging disability starting on April 9, 2011[1] (AR 51, 165, 205), due to bipolar disorder; depression; OCD; PTSD; "several phobias"; panic attacks/anxiety; and back, ankle, and leg pain (AR 209).[2]

---

[1]  SSI benefits may be paid no earlier than the month following the month a claimant files an application.  *See* 20 C.F.R. § 416.335.  Given that Bessette protectively filed her application in April 2011, she is eligible to receive benefits for the period beginning in May 2011.

[2]  This was Bessette's second application for SSI.  The first was filed in November 2008 and denied by an ALJ in April 2011.  After the Appeals Council rejected her request for review of that decision, Bessette did not appeal to the district court.

Her application was denied initially and upon reconsideration, and she timely requested an administrative hearing. On December 20, 2012, Administrative Law Judge (ALJ) Matthew Levin conducted a hearing on the application. (AR 28–50.) Bessette appeared and testified, and was represented by counsel. A vocational expert (VE) also testified at the hearing. (AR 44–49.) On January 14, 2013, the ALJ issued a decision finding that Bessette was not disabled under the Social Security Act from April 9, 2011 through the date of the decision. (AR 7–26.) Thereafter, the Appeals Council denied Bessette's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–4.) Having exhausted her administrative remedies, Bessette filed the Complaint in this action on April 24, 2014. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

4

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Levin first determined that Bessette had not engaged in substantial gainful activity since her application date.  (AR 12.)  At step two, the ALJ found that Bessette had the severe impairments of mild degenerative disc disease of the lumbar spine, depression/anxiety, and ADHD.  (*Id.*)  At step three, the ALJ determined that none of Bessette's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 15.)  Next, the ALJ determined that Bessette had the RFC to perform "light work," as defined in 20 C.F.R. § 416.967(b), except as follows:

> [Bessette] can lift and/or carry twenty pounds occasionally and ten pounds frequently; sit, stand[,] and walk for six hours in an eight-hour workday; use her hands and feet to operate controls and to push and pull; occasionally climb, balance, stoop, kneel, crouch[,] and crawl; perform simple, unskilled work in a low[-]stress environment (defined as requiring little to no change in the work setting and little to no need for the use of judgment), must avoid social interaction with the general public, can have limited social interaction with coworkers, can have occasional contact with supervisors, and is able to maintain attention and concentration for two[-]hour increments throughout an eight[-]hour work day.

(AR 17.)  At the fourth step, the ALJ found that Bessette had no past relevant work, given that she had never worked at the substantial gainful activity level.  (AR 20.)  Finally, considering the VE's testimony, the ALJ determined that there were other jobs existing in significant numbers in the national economy that Bessette could perform, including the jobs of laundry sorter, office cleaner, and price marker.  (AR 21.)  The ALJ concluded that Bessette had not been under a disability from the application date of April 9, 2011 through the date of the decision.  (AR 22.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard."  *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>Analysis</u>

## I.    ALJ's Analysis of Medical Opinions

Bessette argues that the ALJ failed to properly assess the opinions of treating physician Nellie Wirsing, M.D., and examining consultant Dennis Reichardt, Ph.D.  In

response, the Commissioner contends the ALJ committed no error in his analysis of these medical opinions, and substantial evidence supports the ALJ's findings.

### A.    Relevant Law

Under the treating physician rule, a treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). Even when a treating physician's opinions are not given controlling weight, the regulations require the ALJ to consider several factors—including the length of the treatment relationship, the frequency of examination, whether the opinions are supported by relevant evidence and consistent with the record as a whole, and whether the physician is a specialist in the medical area addressed in the opinions—in determining how much weight they should receive. *Id.* at § 416.927(c); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). In addition, the regulations provide that the ALJ "will always give good reasons in [his] . . . decision for the weight [he] give[s] [to the claimant's] treating source's opinion." 20 C.F.R. § 416.927(c)(2); *see Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998).

Generally, where there are conflicting opinions between treating and consulting sources, the "consulting physician's opinions or report should be given limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). This is particularly true where the consultant did not examine the claimant and made his or her opinions without considering the relevant treating source opinions. *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not

personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal quotation marks omitted); *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (where it is unclear whether consultant reviewed all of claimant's relevant medical information, consultant's opinion is not supported by evidence of record as required to override treating physician opinion).

### B.   Treating Physician Dr. Wirsing

Dr. Wirsing, a family practice physician, began treating Bessette in September 2010.  (AR 354, 1039.)  In January 2011, Dr. Wirsing completed a Medical Source Statement (MSS) regarding Bessette's ability to perform work-related mental activities. (AR 349–59, 1279–84.)  Therein, Dr. Wirsing opined that Bessette had "marked" difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and had experienced four or more episodes of decompensation of extended duration.  (AR 351, 1281.)  Dr. Wirsing further opined that Bessette had "substantial loss of ability" to maintain concentration and attention for two-hour segments, work in coordination with or proximity to others, get along with coworkers or peers, and accept instructions and respond appropriately to criticism from supervisors.  (AR 352, 1282.) Dr. Wirsing explained: "[Bessette] does not do well with authority.  She has been incarcerated for these issues before.  [She] [d]oes not have close friends [and is] [u]nable to focus [and] complete complex tasks."  (*Id.*)  Dr. Wirsing concluded that, "base[d] on [Bessette's] previous work experience," Bessette would miss work two to three days each week due to her mental impairments.  (AR 353, 1283.)  In December 2012, Dr. Wirsing stated in a letter to Bessette's attorney that Bessette still suffered from the same

limitations and restrictions outlined in her January 2011 MSS, although she had begun

taking medication for her ADHD, bipolar disorder, depression, anxiety, and insomnia.

(AR 344.)  Dr. Wirsing listed the following "medically documented mental status

findings" to support her January 2011 MSS: agoraphobia/panic attacks, unable to tolerate

group counseling, poor focus and concentration, labile moods, depressed mood, and sleep

disturbance.  (AR 346.)

The ALJ gave "[l]imited weight" to Dr. Wirsing's opinions for two principal

reasons: (1) the medical record, including Dr. Wirsing's own treatment notes, does not

support her opinions; and (2) Dr. Wirsing's opinions are inconsistent with the record as a

whole.  (AR 19.)  These reasons are not supported by the record, and thus they do not

constitute "good reasons" to afford limited weight to a treating physician's opinions.  *See

Schaal*, 134 F.3d at 505.  Contrary to the ALJ's findings, Dr. Wirsing's treatment notes

are littered with documentation of Bessette's serious mental health problems.  For

example, in a December 2010 treatment note, Dr. Wirsing observed that, although

Bessette presented as well groomed and dressed and made good eye contact; she was

"fairly activated and hyperactive," speaking "fairly quickly."  (AR 1036.)  In January

2011, Dr. Wirsing referred Bessette to psychiatrists Dr. Genevieve Williamson and Dr.

James Jacobson for extensive psychiatric testing due to concerns about Bessette's mental

health.  (AR 264.)  The consult note from Drs. Williamson and Jacobson states that Dr.

Wirsing referred Bessette "in light of multiple previous psychiatric diagnoses and

uncertainty about [the] efficacy of [Bessette's] current psychiatric medications in

targeting her symptoms."  (*Id.*)  In a January 30, 2011 treatment note, Dr. Wirsing

recorded that Bessette stated she had been "unable to really communicate with [Drs. Williamson and Jacobson]" and thus did not want to return to them, but she was willing to see another psychiatrist, as Dr. Wirsing explained to her that she "[did not] feel comfortable managing her multiple mental illnesses with a combo of stimulants and benzos."  (AR 1310.)  Dr. Wirsing recorded that Bessette reported having "a lot of lows lately," being unable to control her bipolar disorder well, and experiencing short periods of mania with occasional fleeting suicidal ideation.  (*Id.*)  Dr. Wirsing stated: "[Bessette] does seem quite limited from a mental illness standpoint."  (*Id.*)

In an August 2011 treatment note, Dr. Wirsing stated that Bessette was feeling depressed and sad with occasional suicidal ideation; had poor attention/concentration, limited short-term memory, and poor energy level; and was not sleeping well.  (AR 285.) In a January 2012 treatment note, Dr. Wirsing stated that Bessette did not feel she could manage her own finances, was afraid to go downstairs in her house, was having "[m]ore issues" with social phobia, was still having labile moods, and admitted to fleeting thoughts of suicide.  (AR 335.)  The note further states that Bessette was attending Alcoholics Anonymous meetings but "[s]its in the back[,] as being close to the group makes her overly anxious."  (*Id.*)  In a June 2012 treatment note, Dr. Wirsing stated that Bessette's anxiety and depression were "bad," that she was having a hard time sleeping on her own, that she was "easily distracted," and that the Doctor had been trying to get Bessette to see "Psychiatry" but was having "limited success."  (AR 331.)  Dr. Wirsing "[s]trongly counseled" Bessette to see a counselor.  (AR 332.)

11

The Commissioner asserts that the treatment record reflects a well-groomed, attentive, and mentally healthy patient in Bessette.  (Doc. 15 at 19.)  As indicated above, however, this is not an accurate picture.  Although the record reflects that, at times, Bessette presented as well groomed and exhibiting logical thought content and normal mood; she also presented as hostile, inattentive, and labile at times.  For example, in his September 2009 Psychological Report, Dr. Reichardt stated that Bessette "apparently used very poor judgment" over the years; "uses obsessive-compulsive defenses to attempt to contain her manic energies"; "has had behavioral problem[s] around anger from an early age"; "sounds to have a[n] intermittent explosive disorder"; and has antisocial personality traits and symptoms of PTSD from being in abusive relationships, low trust of others, and borderline/low mental abilities.  (AR 793.)  Dr. Reichardt concluded that Bessette's prognosis for positive change in counseling and for retaining employment "would be poor."  (AR 793–94.)  The January 2011 progress note of Drs. Williamson and Jacobson similarly depicts Bessette as someone having serious difficulty with mental functioning.  (AR 264–72.)  Drs. Williamson and Jacobson observed that Bessette's mood was "reactive"; her affect was "labile" and "[i]nitially moderately restricted," "at times transiently tearful consistent with emotional thought content, but with abrupt resolution," and then "hostile" when her requests for ADHD prescriptions were not immediately met; and she had "fair-to-poor" impulse control.[3]  (AR 269.)  The Doctors stated: "[Bessette's] reported past history of suicide attempt, mood disorder, mood

---

[3]  Likewise, a May 2011 progress note written by treating physician Dr. Jennifer Kaufman describes Bessette as "[v]erbose and tangential."  (AR 274.)

lability, and impulsivity pose a risk of future suicide attempt that could be greatly augmented in the event of relapse into substance abuse, for which [Bessette] is at great risk." (AR 270.) Drs. Williamson and Jacobson further stated that "Bessette's inattention and distractibility, coupled with her very believable account that they have been present since childhood, are suggestive of [ADHD] of the combined type." (*Id.*) Drs. Williamson and Jacobson felt there was "uncertainty" in diagnosing Bessette, finding that, although she may meet the diagnostic criteria for bipolar II disorder, her symptoms also could be reflective of "under-treated mania or hypomania." (*Id.*) In any event, the Doctors opined that Bessette's symptoms "should be targeted with appropriate mood-stabilizing agents prior to reassessment of any remaining inattentive/hyperactive symptoms and a subsequent trial of psychostimulants." (*Id.*)

These observations of examining consultants Drs. Reichardt, Williamson, and Jacobson align with those of Dr. Wirsing, discussed above, and reflect that Bessette presented as a sometimes hostile and often distracted and inattentive individual who had serious sleep problems, low energy, and occasional thoughts of suicide. Furthermore, Dr. Wirsing's particular opinions regarding Bessette's limited ability to maintain social functioning are consistent with those of other physicians, including: nonexamining agency consultant Dr. Roy Shapiro, who opined that Bessette was "[m]arkedly limited" in her ability to interact appropriately with the general public and "[m]oderately limited" in her ability to accept instructions and respond appropriately to criticism from supervisors (AR 86–87); nonexamining agency consultant Dr. Edward Schwartzreich, who opined that Bessette "should not work directly with the public due to anger issues"

13

and "will do best with adequate supervision" (AR 812); and, once again, examining consultant Dr. Reichardt, who opined (as noted above and discussed in more detail below) that Bessette's "combined issues would suggest her prognosis for retaining employment would be poor" (AR 794).  All of these physicians agreed that Bessette had serious problems interacting with the general public and maintaining social relationships. Moreover, both Dr. Reichardt and Drs. Williamson/Jacobson assigned Bessette a Global Assessment of Functioning (GAF)[4] score of 50, Dr. Reichardt in August 2009 and Drs. Williamson/Jacobson in January 2011, which indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 32 (4th ed. 2000).

Accordingly, the Court finds that the ALJ erred in affording little weight to the opinions of Dr. Wirsing.

## C.    Examining Consultant Dr. Reichardt

The ALJ also erred in affording "limited weight" to the opinions of examining consultant Dr. Reichardt.  (AR 19.)  The ALJ's reasoning–that Dr. Reichardt's opinions are "based upon [Bessette's] self-report" and "inconsistent with the evidentiary record as a whole" (*id.*)–is not supported by substantial evidence.  First, as noted above, Dr.

---

[4]  "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (alteration in original) (quoting *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 32 (4th ed. 2000).

Reichardt's opinions are consistent with those of Dr. Wirsing and other consulting physicians.  Second, the ALJ's finding that Dr. Reichardt's opinions are based only on Bessette's self-report is inaccurate, given that Dr. Reichardt's report is based on a detailed examination procedure, including clinical interview, mental status examination, and intelligence testing.  (AR 791–94.)  Moreover, it was proper for Dr. Reichardt to consider and incorporate Bessette's subjective complaints into his evaluation, as a consulting examiner is not required to disregard the claimant's subjective complaints, especially in the context of mental impairments; rather, he is required to take these complaints into account in making diagnoses and opinions regarding the claimant's functionality.  *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("The fact that [the doctor] . . . relied on [the claimant's] subjective complaints hardly undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool.") (internal quotation marks and brackets omitted); *Westphal v. Eastman Kodak Co.*, No. 05-CV-6120, 2006 WL 1720380, at *5 (W.D.N.Y. June 21, 2006) ("in the context of a psychiatric evaluation, an opinion based on personal examination is inherently more reliable than an opinion based on a cold record because observation of the patient is critical to understanding the subjective nature of the patient's disease and in making a reasoned diagnosis").

Third, the ALJ failed to mention Dr. Reichardt's assignment of a GAF score of 50 to Bessette (AR 794), which aligns with the GAF score assigned by Drs. Williamson and Jacobson (AR 271), and which indicates serious mental symptoms or limitations, as explained above.  Although the Social Security regulations and applicable case law do

15

not require ALJs to reference GAF scores in their decisions, *see Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002); *Parker v. Comm'r of Soc. Sec.*, Civil Action No. 2:10-CV-195, 2011 WL 1838981 (D. Vt. May 13, 2011), the ALJ here should have noted that more than one examining physician assigned a score as low as 50 to Bessette, particularly in light of the other medical evidence of serious mental limitations.

Instead of giving significant weight to the opinions of treating physician Dr. Wirsing and examining consultant Dr. Reichardt, the ALJ gave "great weight" to the opinions of agency consultant Kathryn Pedersen, MS, MA, LMHC, who examined Bessette only one time and who is not a physician or psychologist.  (AR 17; *see* AR 300–05.)  The ALJ failed to acknowledge that Pedersen had no treating relationship with Bessette and was not an acceptable medical source.  *See* 20 C.F.R. § 404.1513(a) ("acceptable medical sources" include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists), § 404.1513(d) ("[o]ther sources" include medical sources not listed above, such as nurse-practitioners, physician's assistants, naturopaths, chiropractors, audiologists, and therapists).  Nor did the ALJ acknowledge that Pedersen stated in her report that Bessette relied on her mother to manage her checkbook, prepare her meals, do her laundry, and clean her bathroom.  (AR 303.)

The ALJ's failure to give more weight to the opinions of Dr. Wirsing and Dr. Reichardt–despite their supportability and consistency with the record–is not harmless error, given that, if these opinions were adopted, Bessette's social limitations including

her symptoms of explosive disorder and difficulty interacting with others and responding appropriately to instruction and criticism from supervisors, would likely preclude her from being able to do the jobs listed in the ALJ's decision.  The VE testified at the administrative hearing that "one must always respond appropriately with supervisors[;] [a]nd if the response is inappropriate, that would certainly lead to termination."  (AR 48.)

## II.    Remaining Arguments

In addition to claiming that the ALJ erred in his analysis of the medical opinions, Bessette argues that the ALJ's RFC determination is not supported by substantial evidence (Doc. 14-1 at 12–13, Doc. 18 at 1–4), and the ALJ should have considered whether Bessette met or medically equaled the criteria for an intellectual disability under Listing 12.05(c) (Doc. 14-1 at 13–14, Doc. 18 at 10).  The Court does not decide these issues because the ALJ's RFC determination and step-three assessment of whether Bessette met the criteria of Listing 12.05(c) were necessarily affected by the ALJ's analysis of the opinions of Dr. Wirsing and Dr. Reichardt, and should be determined anew on remand after the ALJ has reassessed these opinions.

## Conclusion

For these reasons, the Court GRANTS Bessette's motion (Doc. 14), DENIES the Commissioner's motion (Doc. 15), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 10th day of August, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

17